36 N. Y. 292–DISTINGUISHED, 60 N. Y. 452.

GEORGE A. CISCO, Appellant, *v.* MARSHALL O. ROBERTS, Respondent.

The State laws regulating port pilotage are not superseded by the act of congress, prescribing pilot regulations for steam vessels navigating the high seas.

In the absence of federal legislation, the States have the right to protect their commerce, by exercising, on the neighboring seas, the power accorded for that purpose to every maritime people.

Pilots, licensed for the port of New York by State authority, are entitled to off-shore pilotage, when they comply with the regulations prescribed, by tendering their services at sea to vessels about to enter that port.

THE appeal was from a judgment of the General Term of the Superior Court of the city of New York, in favor of the defendant, upon a verdict subject to the opinion of the court.

The action was brought by the plaintiff, as a licensed pilot for the port of New York, under the existing pilotage laws of this State, to recover the sum of $57.60, due as pilotage of the defendant's steamer *Empire City*, into the port of New York, the plaintiff having offered his services to pilot the vessel into port, and having been refused, and he being the first pilot so offering service. He claimed "*off-shore*" pilotage, having offered his services at a distance from port entitling him thereto.

The plaintiff was a pilot for the port of New York, by the way of Sandy Hook, duly licensed by the board of commissioners of pilots created by the act of the legislature of June 29, 1853, "*to provide for the licensing and government of the pilots and regulating pilotage of the port of New York.*" (See pilotage act, June 28, 1853, chap. 467, p. 921; amendatory act, April 11, 1854, Laws 1854, chap. 196, p. 459; amendatory act, April 4, 1857, Laws 1857, chap. 243, p. 500.)

Section thirteen of this act establishes the rates of pilotage, and provides for *off-shore* pilotage as follows:

"When any ship or vessel bound to the port of New York, and boarded by any pilot appointed by this board, at

*Statement of case.*

such a distance to the southward or eastward of Sandy Hook light-house, as that said light-house could not be seen from the deck of such ship or vessel in the day-time and in fair weather, the addition of one-fourth to the rates of pilotage hereinbefore mentioned shall be allowed to such pilot."

Section fifteen provides that, the rates of pilotage for any intermediate distance shall be determined by the board of commissioners of pilots.

Section seventeen makes the pilotage payable by the master, owner, etc., of the vessel.

Section twenty-nine provides that " all vessels sailing under register, bound to or from the port of New York, by the way of Sandy Hook, shall take a licensed pilot, or, in case of refusal to take such pilot, the master shall himself, or the owner or consignee shall pay the said pilotage, as if one had been employed; and such pilotage shall be paid to the pilot first speaking or offering his services as pilot to such vessel." (§ 29, as amended, Laws 1857, chap. 243, p. 500.)

Section twelve empowers the board of commissioners of pilots " to make, promulgate and enforce new rules and regulations, not inconsistent with the laws of this State or the United States, to be binding upon all pilots licensed by them and upon all persons employing such pilots."

Under the above provisions the board of commissioners of pilots made and promulgated rules and regulations, among which are stringent rules requiring pilots, under heavy penalties, to perform their duties in boarding and piloting vessels; and they also provided as follows:

18. " The *pilotage ground of the port of New York* shall be deemed to be west of a line drawn in the shortest direction from Fire Island light to that of Barnegat light, which line shall run S. W. ¼ S. and N. E. ¼ N., and west of that line, vessels subject to pilotage must take the first pilot offering his services or pay the pilotage."

On the 28th of December, 1857, the plaintiff, in the discharge of his duty as pilot, was cruising on the pilotage ground, and, in the afternoon of that day, hailed the steamer *Empire City*, of which the defendant is owner, bound for the

port of New York, on a voyage from Aspinwall, and offered his services to pilot her into port. He was the first pilot speaking her or offering his services. The steamer refused to take him, and proceeded on her course; and, after having been spoken by the plaintiff and before reaching the port of New York, took on board as pilot, John Maginn, a pilot also duly licensed by the board of commissioners of pilots, and who held, *besides, a license as steamer pilot, under the act of congress* of August 30, 1852, entitled "An act to provide greater security for the lives of passengers on board of vessels propelled in whole or in part by steam." John Maginn piloted the vessel into the port of New York.

The plaintiff claimed that the pilotage of the vessel should be paid to him, under sections thirteen and twenty-nine of the pilotage act, and rule eighteen of the board of commissioners of pilots. The defendant refused payment, claiming that the provisions of the State law do not apply to steamers since the passage of the act of congress of 1852, and that the taking of a pilot licensed by the board was a sufficient compliance with the law. The defendant also claimed, that the State pilotage laws of New York are repugnant to the Constitution of the United States.

The pilotage allowed by the New York pilot law, for piloting the steamer into port, amounted, with interest, to $66.66, provided off-shore pilotage is allowed under section thirteen of the act. The pilotage at the ordinary rate amounted to $50.

The above facts appeared at the trial, before Mr. Justice Hoffman and a jury; and there being no disputed question of fact, the jury, under the direction of the court, rendered a verdict for the plaintiff for the full amount of the off-shore pilotage, $66.66, subject to the opinion of the court, at General Term, with liberty to reduce the amount to $50, if the plaintiff was not entitled to off-shore pilotage. Judgment was suspended, and the court at General Term set aside the verdict, and ordered judgment for the defendant.

The plaintiff appealed to this court.

*Wm. Allen Butler*, for the appellant.

*Gilbert Dean*, for the respondent.

PORTER J.  The Superior Court rendered judgment for the defendant, on the ground that our State laws for the regula-, tion of port pilotage, so far as they apply to vessels propelled by steam, are in conflict with the acts of congress. (Sess. Laws 1853, 921; id., 1854, 459; id., 1857, 500; 1 U. S. Stat-ates at Large, 54; 5 id., 153; 10 id., 61.)  The validity of our legislation on this subject, except so far as it may have been affected by the statute last cited, which was enacted in 1852, had been settled by a previous decision of the ultimate federal tribunal. (*Cooley* v. *Port-wardens of Philadelphia*, 12 How., U. S., 209).  Since the present cause was decided in the court below, the Supreme Court of the United States has adjudged that the act of 1852 is applicable only to the class of pilots attached to particular vessels and charged with the duty of navigating them on the voyage; and that it does not super-sede the authority of the States to regulate pilotage at their own ports for the protection of general commerce. (*Steam-ship Co.* v. *Joliffe*, 2 Wallace, 450, 461–2; *Gilman* v. *Phila-delphia*, 3 Wallace, 731.)  It follows that, upon the facts proved, the plaintiff was entitled to judgment.

It is unnecessary to determine the purpose and effect of the acts of 1866, to which we have been referred, as the correctness of the decision under review depends on the antecedent state of the law.  No subsequent congressional legislation would justify us in upholding a judgment con-fessedly erroneous, or in denying the right acquired by the plaintiff under the authority of State laws, the validity of which has been sustained in the federal courts.

The claim that the plaintiff is not entitled to off-shore pilotage rests upon a misapprehension of the limits of gov-ernmental authority in a maritime state or nation.  It is not an issue as to the relative boundaries of State and federal jurisdiction; for, in this respect, all that belongs to either is confessedly vested in the States, in the absence of federal legislation.  The proposition of the defendant involves a

denial to either jurisdiction of the power, claimed by every maritime nation, to exercise such rights on the neighboring seas—the common domain of all—as are essential to the protection of its own territorial dominion. We entertain no doubt of the existence of this power. The regulations of port pilotage stand, substantially, on the same footing with our quarantine laws. It is the right and the duty of the State, by appropriate legislation, to guard the public health and the security of general commerce, and to provide against the dangers to which every maritime people are exposed, by intercepting and averting them on the sea, without the bounds of exclusive territorial dominion. (*Gilman* v. *Philadelphia*, 3 Wallace, 726, 730.)

It is urged that such a power is subject to abuse; but this is no argument against its existence. The owners of every registered vessel, leaving or entering our ports, must be content to acquiesce in our regulations for the security of general commerce; and it is no cause of just complaint, that, in common with other maritime States, we exact reasonable compensation for services tendered by our pilots, those hardy sentinels of the sea, whom we encourage to encounter its severest hazards, for the protection of property and life against the perils of an ocean coast.

The judgment of the Superior Court should be reversed, and judgment should be directed for the plaintiff for $66.66, with interest and costs.

All the judges concurring, except GROVER, J., who was for affirmance,

Judgment accordingly.