THOMPSON *vs.* SPRAIGUE, SOULLE & COMPANY.

1. Under section 1512 of the Code, any master or commander of a ship or vessel bearing towards any of the ports or harbors of this state (except coasters in this state, plying between the ports of this state and those of South Carolina and Florida), is bound to receive on board the first pilot who shall offer his services outside the bar, exhibiting his license, if demanded; on refusing so to do, he becomes liable, on arriving in such port, to pay the pilot so offering the full rate of pilotage established by law for such vessel.

(*a.*) Commercial necessity calls for hardy, energetic and fearless pilots; and it is the policy of the state to encourage enterprise and engender among the pilots a laudable rivalry to venture beyond the bar or its immediate proximity, and thus to be ever ready to lend aid to vessels making for the port.

(*b.*) Section 1517 of the Code applies to a different right from that given by section 1512. Compare also sections 1511, 1513.

2. A prior contract between the master or commander of a vessel and another pilot to receive him on board at a point nearer the bar, will not give the right to reject the pilot first offering, without becoming responsible for his fees under section 1512.

3. The master of a ship, when acting within the scope of his authority, is the agent of the owner, and his act in rejecting the proffered services of a pilot is the act of the owner. Especially is this the case where the master was following instructions and carrying out the contract made with another pilot by his principals.

(*a.*) The liability to the first pilot offering is under an implied contract to employ and pay a pilot so offering; the recovery is on such implied contract, and not as a penalty.

4. Section 1512 of the Code is not repugnant to art. 4, sec. 2, par. 1, of the constitution of the United States, which declares that " the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," nor is it repugnant to the fourteenth amendment to the constitution of the United States.

(*a.*) There is nothing to prevent citizens of other states from running coasters between the ports of Georgia and those of South Carolina and Florida, nor is there any presumption that the home port of a vessel, or port from which it starts, is the place of citizenship of the owner of the vessel.

(*b.*) If there were any such presumption, an act of the legislature will not be declared unconstitutional on account of a mere presumption.

5. Construing sections 4237 and 4236 of the revised statutes of the

United States together, and comparing section 1512 of the Code of Georgia with them, it appears that the exception made in the Georgia law in favor of coasters between the ports of Georgia and those of South Carolina and Florida, is contrary to section 4237, and annulled by it, except as to those ports situated upon waters which are the boundary between Georgia and those states. As to these, the master of a vessel may employ any pilot licensed or authorized by the laws of either state.

(*a.*) That an exception in section 1512 of the Code in favor of certain vessels is repugnant to the statute of the United States, annuls such exception but does not invalidate the remainder of the section, the objectionable part being separable from the balance.

(*b.*) Construing sections 4444 and 4401 of the revised statutes of the United States together, they mean that when a steam vessel not sailing under register (that is, not trading with foreign ports) is on her coastwise voyage, she must have on board a pilot licensed by the United States authorities. But a license issued by the inspectors at Philadelphia to the master of a vessel as pilot for the Atlantic coast, will not be construed to include the right to cross the Tybee bar, and pass up the Savannah river to the port of Savannah. Nor does the exception of coastwise steam vessels from the operation of state laws contained in section 4444 of the revised statutes, include coastwise steamers whose masters or captains have no license to pilot within the bar and up the rivers of the state, from the United States authorities. If they have such license from the United States authorities, no state law shall require an additional license or enforce the collection of the fees of a pilot licensed by the state. But if there be no pilot on board licensed by the United States authorities to pilot the steamer within the bar and up the river, the state law remains of force.

(*c.*) It is no excuse for refusing a pilot that the vessel was on the Atlantic coast, off the coast of South Carolina, when his services were offered. The Savannah river is the boundary between Georgia and South Carolina, and so soon as the pilot crosses the Tybee bar and steers north, he is technically off the coast of South Carolina. To rule that this places him beyond the operation of the law, would be to confine him within the bar and curtail his usefulness.

January 30, 1883.

Pilots. Contracts. Laws. Public Policy. Constitutional Law. Before Judge TOMPKINS. Chatham Superior Court. June Term, 1882.

In addition to the report contained in the decision, it is only necessary to state that the case was submitted to the presiding judge without a jury; and that he decided as follows:

"(1.) The plaintiff has no cause of action against the defendants under either of the sections 1512 or 1517 of the Code of Georgia. And this is held, even if the said section 1512 is constitutional, and was not annulled by section 4237 of the revised statutes of the United States, because the said steamer Saxon did take a pilot authorized by section 4444 of the revised statutes to pilot the vessel.

(2.) The said section 1512 of the Code of Georgia is unconstitutional and void, and neither the masters nor owners, nor consignees of any vessel, nor is the vessel itself liable in any manner whatever to any pilot under the provisions of sections 1512 and 1517 of the said Code. And this applies to all coasting vessels of every kind and description, whether propelled by sail or by steam, or by both. [And the better opinion would seem to be that this ruling applies also to all American ships coming into the waters of Georgia, whether from domestic or foreign ports. For, to hold otherwise, would be to place an American vessel coming from a foreign port at a disadvantage, as compared with an American vessel engaged in the coasting trade. It, therefore, is held to be law that American vessels, other than coastwise steamers, can come into and depart from the ports of this state without being compelled by state or federal authority to engage or accept the services of a pilot of any kind. For if the coasters of this state are exempt from taking pilots, then all coasters of each of the states are likewise exempt; and as only American vessels can be coasters, then all American vessels must be allowed the same privileges and immunities under the laws of Georgia as are allowed any special class of American vessels.]

(3.) American steam vessels engaged in the coasting trade can be piloted by their masters or mates, provided

they shall have been licensed as pilots by the inspectors of the collection district in which the ports are situated.

(4.) Such steam vessels, so engaged in the coasting trade, are not compelled to be piloted by any one who has received a license from any board of pilot commissioners at any port in Georgia appointed by the state authorities, but are compelled to be piloted by some one duly licensed or authorized by the inspectors of the collection district of the port so entered by such vessel.

(5.) Vessels, of whatever character, size or nationality, other than steam vessels engaged in the coasting trade, are not compelled by any law, state or federal, to accept or employ the services of any pilot upon entering or leaving any port, harbor, bay, road or inlet in the state of Georgia."

J. J. ABRAMS; LESTER & RAVENEL; R. R. RICHARDS, for plaintiff in error.

LAWTON & CUNNINGHAM, for defendants.

JACKSON, Chief Justice.

This suit was instituted by the plaintiff in error against the defendants for $93 16-100, alleged to be due plaintiff as a pilot for the port of Savannah, based on the refusal of the defendants, owners of the steamship Saxon, through the master of said steamer as their agent, to receive said pilot and permit him to pilot the ship over Tybee bar and up the river to Savannah. By agreement of counsel, the case was submitted to the court below without the intervention of a jury, on an agreed statement of facts. Whereupon judgment was rendered for the defendants, and the plaintiff excepted.

The facts agreed upon are substantially:

That the steamer Saxon is a licensed coastwise vessel, engaged in trading between Philadelphia and Savannah, and belongs to the defendants, who are residents of Penn-

sylvania.   That in August, 1881, she was commanded by
one S. W. Snow, who was duly licensed as master and
pilot under Title 52 of the Revised Statutes of the
United States, the said certificate as pilot and master
being issued in November, 1880, by the Board of Inspectors
at Philadelphia for the *Atlantic coast*, and did not include,
*eo nomine*, Tybee bar and the Savannah river.   That on
9th of August, 1881, as said steamer was proceeding from
Philadelphia to Savannah, she was spoken by the plaintiff
off Cape Romain, on the South Carolina coast, who then
tendered his services to the said  master of said steamer
Saxon as a pilot for Tybee bar and  the  Savannah river,
and that at the time such services were tendered there
was no pilot on board the said steamer for the said Tybee
bar and  Savannah river, and  that plaintiff was the first
pilot who spoke said vessel on her said trip to Savannah,.
and that plaintiff was duly licensed both by the Pilot
Commissioners of this state and the United States In-
spectors at the port of Savannah, as a pilot for the " Sa-
vannah river " and " Tybee bar," to conduct steam vessels.
over said bar and up and  down said river.   The plaintiff
being apprised that said vessel had sailed from Philadel-
phia for Savannah, went out to meet her.   That the defend-
ants had procured the services of  one Walter W. Smith,
who was also duly licensed both by the state authorities.
and by the United States Inspectors to conduct steam ves-
sels over  Tybee bar and up  and  down the Savannah
river; and that said defendants had notified the said
master of said steamer to stop at Martin's Industry light
ship (which is between said Cape Romain and Tybee bar),.
and there to take said pilot W. W. Smith on board to pilot
said steamer Saxon over Tybee bar and up the Savan-
nah river; and that said Smith was so taken on board on
the 10th of August, 1881, and did pilot the said vessel
over the said bar and  up  the  said river; and that the
said Smith was in the pay of said defendants, from the
time the said vessel left Philadelphia, and was regluarly

employed by said defendants in August last, and has so continued to be employed as the pilot of said vessel in and out of Savannah on her regular trips. That Smith was in Savannah when the vessel left Philadelphia, and met her at Martin's Industry light ship by agreement the day after she was spoken by plaintiff at sea. That according to rates of pilotage established by the Pilot Commissioners of Savannah, under the state laws, the proper charge for piloting said steamer inward over the bar and up to Savannah was $93 17-100, the said vessel drawing seventeen feet and six inches. That Philadelphia was the home port of said steamer, and that the captains and masters of the steamers of the Ocean Steamship Company of Savannah, whose home port is Savannah, have each a license from the state and the United States authorities at Savannah to pilot their vessels over the bar at Tybee and up and down the Savannah river to this city.

The counsel for plaintiff contended that under these facts he was entitled to a judgment, by reason of the law set forth in the Code of Georgia, beginning with section 1504. That under section 1511 plaintiff had offered his services to the defendant's vessel, and that under the section 1512 he was authorized to sue for and collect from the defendants "the full rates of pilotage established by law for such vessel," which rates are admitted would be the sum sued for under the provisions of the rules made by the Commissioners of Pilotage appointed by the authorities of the city of Savannah for the "bar of Tybee and Savannah river."

The amount involved is undisputed and of small consequence; but the principles ruled by the superior court are of vast importance to the port and pilots of Savannah, as well as to the commerce of the state and country; and the judgment of this court upon all of those principles so ruled has been earnestly invoked by the counsel, and is demanded by these public considerations.

1. If the Code of Georgia is unaffected by the Constitution and laws of the United States, is the plaintiff entitled to recover? The answer depends on the construction of sections 1512 and 1517 of the Code. Section 1512 is as follows: "Any person master or commander of a ship or vessel bearing towards any of the ports or harbors of this state, except coasters in this state, and between the ports of this state and those of South Carolina and between the ports of this state and those of Florida, and who refuses to receive a pilot on board, shall be liable on his arrival in such port in this state to pay the first pilot who may have offered his services outside the bar and exhibited his license, if demanded by the master, the full rates of pilotage established by law for such vessel."

Section 1517 declares that "a pilot bringing a vessel into port shall be entitled to his fees before her departure from port, to be paid in advance or security given for the payment; and on failure thereof he may refuse to carry the vessel out, and all fees for pilotage may be demanded and recovered in any court having jurisdiction, from the owner, master or consignee of the vessel; and if any licensed pilot shall ask or demand more fees for his services than are specified in the rates of pilotage, on due proof thereof before the commissioners, he shall forfeit double the amount of such vessel's pilotage."

The question is, whether these two sections, construed together and in the light of other sections of the Code in the same article, give to the pilot first offering his services the right to recover fees, when another pilot, who afterwards offered his services, was received and conducted the vessel into port under a contract, previously made with the vessel before she left Philadelphia, to meet her at a point nearer the bar.

If there had been no such contract, could he recover, and does the contract, if made, alter his right?

First, in the absence of another's being engaged, when

the plaintiff offered his services and he was refused, could he recover? Such appears to us to be the meaning of section 1512. A pilot was refused, and thereupon the first who tendered his services was entitled to fees. The language of the statute is "who refuses to receive a pilot on board;" then the first "who may have offered his services outside the bar" can recover. Certainly the master of the ship refused to receive a pilot in this case; certainly the plaintiff first offered his services; therefore it would seem that by the very letter of the section the plaintiff could recover, though he did nothing but tender service. That this construction of the section would be clear had not the master of the vessel received another pilot and been piloted over the bar and to Savannah by him, must be admitted by all candid minds; but it is conceded that if the words stood alone, unsupported by other aids to construction, where another pilot was received and carried the vessel into port, the construction would be doubtful.

But there are other sections which throw light upon these words. The preceding section, 1511, enacts that "every pilot boat cruising or standing out to sea, must offer the services of a pilot to the vessel nearest the bar." The pilot cannot elect among vessels which he will offer to serve; but by the same section "for each and every neglect or refusal, either to approach the nearest vessel, or to aid her if required, or to aid any vessel in sight showing signals of distress," he must pay a penalty of fifty dollars, and may lose his license at the option of the commissioners. If the pilot may not, under such pains and penalties, select which vessel he shall serve, shall the vessel select which pilot shall serve it? Ought not the duties and liabilities to be reciprocal, and is the policy of our law otherwise? Did the state mean to give such advantages to the foreign vessel over her own hardy seamen? We hardly think so.

Again, section 1517, above set out, gives to the pilot

bringing in a vessel the right to immediate payment of fees or security therefor before her departure, and on failure he may refuse to carry her out and yet recover all fees therefor, showing that he stands on a different foot- ing from one who was rejected off the bar. The one may recover only for the refusal to receive him; the other for services actually rendered in bringing in the ship and the tender of services to take her out. The two sections provide for totally distinct matters. So that we do not see how the case provided for in 1512 is depend- ent in any wise on 1517. By section 1513, he who brings the vessel in has the exclusive right to take her out; but he who was rejected as her pilot in, has no such right to take her out.

Moreover the policy of the law requires the construc- tion we give the words. That policy is to engender among the pilots a laudable rivalry to venture beyond the bar or its immediate proximity, and thus to be ever ready to lend aid to vessels making for the port. Laws to the same effect as ours, perhaps some of them clearer in lan- guage but in spirit alike, have been given the same construction in other states. Indeed, they are on the statute books of all the maritime states of the union, and so far as we are informed, have received the same construc- tion, and upon the same broad view of commercial ne- cessity for hardy, energetic and fearless pilots. Reward for adventure of all sorts creates its spirit. It is the soul of enterprise, and makes men fit for emergency in all avo- cations of life, especially those which demand exposure to danger and death. See 5 Metcalf, Mass., 416-17; 2 Wall., 450-56., cited by plaintiff in error. In the latter case, the Supreme Court of the United States say, Mr. Justice Field delivering the opinion: "The claim to half pilot fees, it is true, was given by the statute, but only in consideration of services tendered. The object of the regulations established by statute was to create a body of hardy and skillful seamen, thoroughly acquainted with the

harbor, to pilot vessels seeking to enter or depart from the port, and thus give security to life and property exposed to the difficulties of a dangerous navigation. This object would be in a great degree defeated if the selection of a pilot were left to the option of the master of the vessel, or the exertions of a pilot to reach the vessel in order to tender his services, were without remuneration. The experience of all commercial states has shown the necessity, in order to create and maintain an efficient class of pilots, of providing compensation, not only when the services tendered are accepted by the master of the vessel, but also when they are declined. If the services are accepted, a contract is created between the master or owner of the vessel and the pilot.  *  *  *  *  If the services tendered are declined, the half fees allowed are by way of compensation for the exertions and labor made by the pilot, and the expenses and risks incurred by him in placing himself in a position to render the services which, in a majority of cases, would be required."

It will be observed that it makes no difference as to the principle that the California statutes, then under consideration, gave only half fees, even if ours gives the whole to the tendering pilot. Really, however, as the rejected pilot had no right to take out the vessel, the fees sued for being only for bringing her in, are about one-half. We conclude, therefore, that under a fair construction of the statute, in the light of surrounding sections of the Code, of its reason and spirit, of the policy of all maritime states, of the adjudications of other state courts and of the supreme court of the Union bearing on kindred legislation, that, had there been no contract between the Saxon's owners and the pilot she received, the plaintiff would have been entitled to recover.

2. Does the prior contract of the Saxon to take a pilot at a point nearer the bar of Tybee affect the principles above announced, so as to change the result?

We cannot think so, because such prior engagement

would have the effect to destroy the policy on which the statute rests and emasculate its reason and spirit. What encouragement or incentive would the pilot have to venture on his dangerous cruise, if liable to constant disappointment by reason of prior engagement of vessels to others? Much of that incentive to the real manhood of his hardy avocation would be gone, because much of the food which nourished it would be contracted away to others more fortunate, though perchance less adventurous and persevering. The reward would no longer be his whose valor combatted successfully the roughest sea, but his who by craft or cunning, excelled him in the more placid business of contract. The policy of the law of pilotage will not permit Jacob's lamb, cooked however sweetly, to despoil Esau's valor and venizon of their just inheritance.

See further on this and the preceding division of this general subject, cited by plaintiff in error, act of December 6, 1799; Marbury & Crawford's Digest, 592-3-4; Code, §1506; R. M. C.'s Reports, 298; 7 Wall., 53; 102 U. S., 572; 7 Benedict's R., 386.

3. We cannot see that the act of the master of the ship is other than the act of the owner, in rejecting the proffered services of the plaintiff. The master is the agent of the owners when acting within the scope of his authority. If such were not the general law applicable to all cases, it would be law here in this case, because the master was following instructions—carrying out the contract made with another pilot by his principals.

The liability is under the implied contract to employ and pay the pilot first offering, and is recoverable as such, and not as penalty. Wallace, 67; 13 ib., 236.

4. Is the section unconstitutional—that is, in conflict with the constitution of the United States? The learned judge in the Court below so thought, and put his adjudication of the point on the fact that coasters in this state, and between the ports of this state and those of South

Carolina and between the ports of this state and those of Florida, are excepted from its operation. It is insisted that this exception is repugnant to paragraph 1 of section 2 and article 4 of the constitution of the United States, which declares that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." But we cannot see that by this exception citizens of any state are excluded from owning and employing "coasters in this state, or between the ports of this state and those of South Corolina, or between the ports of this state and those of Florida." It will not do to say that citizens alone of Georgia, South Carolina and Florida own these coasters, and are interested in them. It may be that many other citizens of the Union in other states are so interested and have such property. Certainly they may if they wish. There is no prohibition against them in this respect. Nor will it do to argue that the place whence a vessel sails is the home of its owners. It may or it may not be true. Nor is there any presumption in law that the home port is presumed to be the place of citizenship of the owners of the vessel. The presumption would certainly be inapplicable to the steamers belonging to the Savannah steamship company in so far as the real owners are concerned. And it is believed that from all the ports of the world of any consequence many ships are at home and put on the seas whose owners do not reside at the same port, and are not citizens or subjects of the state or country wherein the port is located. Be this as it may, it would be contrary to all principle and precedent to hold an act of the general assembly unconstitutional on a presumption, however strong. This court has often ruled that an act passed by a co-ordinate branch of the government would be reluctantly declared unconstitutional by the judiciary, and its unconstitutionality must be made clearly to appear before it will be done. Where a statute has stood the test of almost a century of trial, it would be stretching judicial power beyond all

precedent now to pronounce it unconstitutional, null and void, because it is presumed that the citizens of other states do not own vessels employed in coasting along the shores of Georgia, South Carolina and Florida, and therefore that it is presumed that the general assembly intended to debar them of the privilege of owning and sailing or propelling coasters along those coasts. The question is not do they own them, or are they so engaged in business, but can they so engage or are they prohibited from so doing.

We are equally at a loss to find anything repugnant in section 1512 of the Code to the fourteenth amendment of the constitution. It is quite certain that it was not in contemplation by the framers of this law in 1799, to come in collision with this amendment of yesterday. Because " all citizens of the various states are declared to be citizens of the United States, and that no state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States, nor shall any state  *  *  *  deny to any person within its jurisdiction the equal protection of the laws," declared in the said fourteenth amendment, is now part of the constitution, it does not appear to us that that instrument guards the equal rights of all citizens of the various states with stronger arms or greater emphasis, so far as this right of engaging in the coasting trade of Georgia, South Carolina and Florida is concerned, than when the old covenant of the fathers proclaimed with less volubility but with singular clearness, that " the citizens of each state shall be entitled to all privileges and immunities of citizens of the several states."

If the Georgia law of pilotage be not repugnant to the old constitution, it is very difficult to see wherein it is repugnant to the new amendment.

See, cited by plaintiff in error, 12 Howard, 299 ; 13 Wall., 236 ; 102 U. S., 575 ; 2 Speer S. C., 769 ; 9 Wheat, 1 ; 1 Kent's Com., 437–8–9 ; 36 .N. Y., 292 ; 5 Stat. at Large, 153 ; Revised Stat., 4236.

5. The question remains, is the Georgia law annulled by any act of congress under the constitution of the United States?

It is clear that congress may, under that instrument, pass general laws upon this subject, and annul the state laws thereon ; because they are therein empowered to regulate commerce between the several states. Have they done so?

Section 1512 of the Code, it is insisted by defendant in error, has been so annulled by enactments of congress, codified in the Revised Statutes, 4237 and 4444.

Those sections are as follows :

§ 4237. "No regulations or provisions shall be adopted by any State which shall make any discrimination in the rate of pilotage or half pilotage between vessels sailing between the ports of different states, or any discrimination against vessels propelled in whole or in part by steam, or against national vessels of the United States ; and all existing regulations or provisions making any such discrimination are annulled and abrogated."

§ 4444. "No state or municipal government shall impose upon pilots of steam vessels any obligation to procure a state or other license in addition to that issued by the United States, or any other regulation which will impede such pilots in the performance of the duties required by this title ; nor shall any pilot charges be levied by any such authority upon any steamer piloted as provided by this title ; and in no case shall the fees charged for the pilotage of any steam vessel exceed the customary and legally established rates in the state where the same is performed. Nothing in this title shall be construed to annul or affect any regulations established by the laws of any state, requiring vessels entering or leaving a port in any such state, other than coastwise steam vessels, to take a pilot duly licensed or authorized by the laws of such state, or of a state situate upon the waters of such state."

First, is section 1512 of the Georgia Code annulled by §4237 of the revised statutes? If it makes any discrimination between vessels from the ports of different states in the rate of pilotage or half pilotage, it is annulled by the act of 13th July, 1866, of congress, codified in said § 4237, to the extent that it makes such discrimination. In our judgment, if §1512 of the Georgia Code exempts vessels sailing from ports in Florida and South Carolina altogether from pilotage fees whilst it exacts

those fees from vessels sailing from ports of other states, it is discrimination in the rate of pilotage in the sense and spirit of the act of congress. The widest possible discrimination is made thereby between those two states and all other states of the Union. The discrimination is between no fees at all and full fees. The difference between naught and one hundred is greater than between any sum and one hundred; and the discrimination is therefore all the greater between the two. Congress could not have intended that the vessels from one state should be exempt altogether, and those from another be charged full rates. The meaning and sense of the statute puts all on an equality.

But the act of congress of 1866 above cited should be construed, we think, in connection with the act of 2d of March, 1837, to be found in the paragraph of the revised statutes immediately preceding §4237, which is as follows:

§ 4236. "The master of any vessel going into or coming out of any port situate upon waters which are the boundary between two states, may employ any pilot duly licensed, or authorized by the laws of either of the states bounded on such waters, to pilot the vessel to or from such port."

South Carolina and Florida are the neighbors of Georgia, the first on the northern and the other on the southern waters of the Atlantic ocean, which is the common boundary of the three on the east. The waters of the Atlantic are the boundary between the territory of Georgia on the one hand and of those two states on the other. Bays and inlets flow into the territory of each and divide or bound that territory. In so far, therefore, as those ports of South Carolina and Florida are concerned which are so situated, it could not have been the intention of congress construing these enactments, revised and codified side by side, in *pari materia*, to annul the Georgia act in reference to the exception which did not compel vessels from such ports to employ Georgia pilots; because such legislation would have been in the teeth of the act of 1837, though seemingly violative of that of 1866; inasmuch as

the act of 1837 provides that a pilot of the port of either state in such cases duly licensed by that state, may be employed. And the reason of the act of 1837 is obvious. In such contiguous ports, coasting vessels constantly plying between them, the pilot of each would be familiar with the waters of both. In respect therefore to such ports of South Carolina and Florida as come within the act of congress of 1837, revised statutes §4236, we think that section 1512 of our Code is not affected by the congressional enactment of 1866, §4237 of the revised statutes; but that the provision or exception in respect to other ports of South Carolina and Florida not fairly within the sense of §4236 of the United States revised statutes is annulled and abrogated.

But does the whole of section 1512 of the Georgia Code thereby fall? By §4237 of the United States revised statutes, it is only "the regulations and provisions making such discriminations" which are annulled and abrogated. The exception in the Georgia statute therefore is abrogated, but not the entire statute. Such is the rule, even if the Constitution of the United States itself had been violated by a part of a statute of the state. If the objectionable part can be taken out of the statute, leaving other parts therein which it may be presumed would have been enacted without the unconstitutional part, that which is free from the unconstitutional taint will remain unaffected. Cooley on Cons. Lim., 214, 215, and cases cited; 103 U. S. 80, 83; 4 *Ga.*, 26. Surely, if a congressional statute, and not the fundamental law itself, be involved, the rule will not be more stringent.

Therefore, striking out the exception in the cases of South Carolina and Florida, as the remaining part would stand, the right of the plaintiff to recover would remain unaffected. The application of the rule that part of a statute may stand, though part be unconstitutional or annulled by constitutional legislation of congress, to this section of our Code will be more apparent when the orig-

inal act, Marbury & Crawford's Digest, p. 492–3–4, is examined, which does not embrace any of the exception or exemption of the Code, except the port of Charleston, from the fact of the close neighborhood and commercial coastwise intercourse of the cities of Georgia and that port. Because that single exception was in conflict with the act of congress, would the entire Georgia act of 1799, published in that digest, be annulled and abrogated? Clearly not, we think.

Secondly, does §4444 of the revised statutes of the United States annul this section 1512 of the Georgia Code? That paragraph must be construed with §4401, which is as follows:

§4401. "All coastwise seagoing vessels, and vessels navigating the great lakes, shall be subject to the navigation laws of the United States, when navigating within the jurisdiction thereof; and all vessels propelled in whole or in part by steam, and navigating as aforesaid, shall be subject to all the rules and regulations established in pursuance of law for the government of steam vessels in passing, as provided by this title, and every coastwise seagoing steam vessel subject to the navigation laws of the United States and to the rules and regulations aforesaid, not sailing under register, shall when under way, except on the high seas, be under the control and direction of pilots licensed by the inspector of steamboats."

This paragraph, like the other, 4444, is under the title, "Regulation of Steam Vessels." It was enacted in 1871, and §4444 was enacted at the same time. Both are in the same act of congress, and when those acts were revised, are put in the same division and title. Construing them together, the two paragraphs mean that when a steam vessel, not sailing under register, that is not trading with foreign ports, is on her coastwise voyage, she must have a pilot aboard, licensed by the United States authorities, and if she has such a pilot aboard, she cannot be interfered with by state laws or regulations. §4444 expressly declares that no pilotage shall be levied by state authority upon any steamer "piloted as provided by this title." Was this steamer, the Saxon, as appears from the record,

so piloted when the plaintiff tendered his services? Smith, the pilot she afterwards received, was not aboard; neither her master nor any other pilot then aboard was licensed by the United States inspector of steamboats to conduct her over Tybee bar and up the Savannah river. The master was licensed by the board of inspectors at Philadelphia for the Atlantic coast, but not *eo nomine* for Tybee bar and the Savannah river. The ship was on the Atlantic coast of the state of South Carolina when she was spoken by the plaintiff. She then and there had on board her master, who was a pilot licensed for that coast, and being a coastwise steam vessel then and there piloted according to title 52 of the revised statutes of the United States, it is insisted by defendant's counsel that she was not bound by the Georgia statute to take the plaintiff as the first pilot who offered himself to her, and that under these facts she cannot be forced, by operation of our statute, to pay him full fees for taking her thence to the port of Savannah; because, it is argued, §4444 of the revised statutes annuls the Georgia act so far as the coastwise voyage of the steamer so piloted is concerned. We cannot hold that the license at Philadelphia to the master of the steamer, as pilot for the Atlantic coast merely, empowered him to go into the Savannah port situated miles up the Savannah river, to pass over Tybee bar and traverse the river, with all its local difficulties of navigation, to a port not on the coast, but up the river some distance therefrom, without the aid of a pilot licensed by the United States local inspectors for Savannah. We hold with the learned judge below, that this license, given by Philadelphia inspectors, expired and was intended by those inspectors to expire with the coast voyage of the vessel. Such appears, too, to have been the view of the owners and master of the vessel; otherwise they would not have engaged the other pilot, Smith, licensed by United States inspectors at Savannah and for the port of Savannah, to meet the vessel off the South

Carolina coast and pilot her over Tybee and up the river to Savannah. Such, too, appears to be the construction put on it by the Savannah Ocean Steamship Company, whose captains and masters each have a license both from the state and United States authorities at Savannah to pilot their vessels over the bar at Tybee and up and down the Savannah river to the city. Such, too, is the construction which sound sense and public policy would put on the statute, or that clause of it under consideration and codified in §4444 of the revised statutes. Inspectors at Philadelphia would be as competent as those at Savannah to license pilots by judging of their competency and fitness for the Atlantic coast; but they would not be to judge of their qualifications to act as pilots over Tybee bar and up and down the Savannah river. Hence, the inspectors at Philadelphia, we think, properly construed the true intent and meaning of the act of congress, and limited the license they gave the master of the Saxon to the Atlantic coast.

The exception in the concluding paragraph of § 4444 of the United States revised statutes, to-wit, "other than coastwise steam vessels" to the general provision that nothing in the whole title 52 shall annul or affect state laws requiring vessels entering a port in such state to take a pilot duly authorized by the laws of the state, does not apply to those coastwise steamers whose masters or captains have no license to pilot within the bar and up the rivers of the state from the United States authorities. If they have such license from the United States authorities to pilot there, then no state law shall require an additional license, and enforce the collection of the fees of a pilot so licensed by the state; but if there be no licensed pilot by United States authority to pilot the steamer within the bar and up the river, then the state law remains of force.

So that the state laws and the United States laws are both thus harmonized, and work smoothly together. Both

stand on good sense and sound policy. Both require license by competent authority at the port to be entered, or at least authority to enter it by the pilot. If it be a coastwise steamer, the license by United States authority will suffice, and the state must not interfere; if any other vessel, the state may enforce its law. If the coastwise steamer be not authorized by license to the master or some other pilot on board to cross the bar and enter the port, then the state law is still operative. If the Georgia law was still operative on this steamer, which was plying towards Tybee bar and bound for Savannah, then she was bound to receive on board the first pilot who tendered service; and when she refused him, his right, by the Georgia statute, and perhaps by general maritime law, was perfect, by implied contract, to recover fees, as though he had effected what he offered to do.

It will not do to say that off the South Carolina coast, when spoken by plaintiff, she was on the Atlantic coast, and the license to her master as pilot was there good. The pilots from Savannah must go outside the bar to meet the incoming vessels. The policy of all maritime law is to push them out to sea. The Savannah river is the boundary between Georgia and South Carolina, and so soon as the pilot boat steers north beyond Tybee bar, she is on the Atlantic and on the South Carolina coast. If then and there a vessel with no licensed pilot for the port of Savannah be at liberty to reject a pilot because the vessel has a coast pilot aboard, when is she bound to receive him? Within the bar? To pilot her over the bar is part of his duty, and this he cannot perform if he does not get aboard outside. So that the great maritime policy, commercial necessity, the safety of ship, of freight, of limb, of life, demands that these hardy seamen push out to sea, and that he who first offers service by encountering danger and risking life, shall receive the reward of his energy and hardihood, and pilot the vessel into port. We do not think that congress intended to annul and abrogate state laws which enact into practical life this prin-

ciple ; but that the statute enacted by that body was designed to exclude from the power of the state to require any license when the authorities of the Union had granted it, leaving the principle that of two licensed by the United States authority, that pilot · who first offered service should be received, and if rejected should be entitled to compensation for his labor and risk according to the state law, still of force.   In this case, therefore, we think, under the facts admitted to be true, that the Georgia statute, section 1512 of the Code, is of force, not being unconstitutional nor annulled, so far as it authorizes plaintiff's recovery, by any act of congress; that the plaintiff is entitled to recover; and that the judgment should be reversed.

Judgment reversed.